THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

✓ FILED ___ ENTERED
____ LOGGED _____ RECEIVED

10:05 am, Jan 13 202

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

| | | |
|---|---|---|
| IN THE MATTER OF THE: | ) | UNDER SEAL |
| | ) | |
| Criminal Complaint for Carlyle Lavar Alvarez, | ) | Misc. No. 1:21-mj-057 TMD |
| | ) | |
| Criminal Complaint for Jennifer Jean Gann, | ) | Misc. No. 1:21-mj-058 TMD |
| | ) | |
| Criminal Complaint for Antoine Anthony Alvarez, | ) | Misc. No. 1:21-mj-059 TMD |
| | ) | |
| Criminal Complaint for Millie Anne Reyes, | ) | Misc. No. 1:21-mj-060 TMD |
| | ) | |
| Criminal Complaint for Courtney Lavell Floyd, a/k/a Courtney Lavelle Floyd, | ) | Misc. No. 1:21-mj-061 TMD |
| | ) | |
| Criminal Complaint for Shanavia Middleton, | ) | Misc. No. 1:21-mj-062 TMD |
| | ) | |
| Criminal Complaint for Ivan Augustus Ransome, and | ) | Misc. No. 1:21-mj-063 TMD |
| | ) | |
| Search of 42 East Avenue, Apartment 1E, Hagerstown, Maryland 21740 | ) | Misc. No. 1:21-mj-064 TMD |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS, ARREST WARRANTS, AND A SEARCH AND SEIZURE WARRANT

I, Derek L. Starliper, being duly sworn, depose and state the following:

### Introduction

1.   I make this Affidavit in support of the following:

   a.   Criminal Complaint and arrest warrant for Carlyle Lavar Alvarez;

   b.   Criminal Complaint and arrest warrant for Jennifer Jean Gann;

   c.   Criminal Complaint and arrest warrant for Antoine Anthony Alvarez;

d.   Criminal Complaint and arrest warrant for Millie Anne Reyes;

e.   Criminal Complaint and arrest warrant for Courtney Lavell Floyd a/k/a Courtney Lavelle Floyd;

f.   Criminal Complaint and arrest warrant for Shanavia Middleton;

g.   Criminal Complaint and arrest warrant for Ivan Augustus Ransome; and

h.   Search and seizure warrant for 42 East Avenue, Apartment 1E, Hagerstown, Maryland 21740, as fully described in Attachment A.

2.      I submit that probable cause exists to believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**"), Jennifer Jean Gann ("**GANN**"), Antoine Anthony Alvarez ("**A. ALVAREZ**"), Millie Anne Reyes ("**REYES**"), Courtney Lavell Floyd a/k/a Courtney Lavelle Floyd ("**FLOYD**"), Shanavia Middleton ("**MIDDLETON**"), Ivan Augustus Ransome ("**RANSOME**") (collectively referred to as the "**Target Subjects**") are engaging in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) 42 East Avenue, Apartment IE, Hagerstown, Maryland 21740, as fully described in Attachment A, (hereinafter referred to as the "**Target Premises**") contains fruits, evidence, and instrumentalities of drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

**<u>Affiant's Background</u>**

3.      I am "an investigative or law enforcement officer . . . of the United States" within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States of America ("United States") who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.      I have been an Inspector with the United States Postal Inspection Service ("USPIS") since October 2018, where I am currently assigned to the Maryland Narcotics Team.

Prior to my employment with USPIS, I was a Special Agent with the United States Attorney's Office for the District of Columbia, assigned to the Violent Crimes and Narcotics Trafficking Section, and a Police Officer with the Metropolitan Police Department (Washington, D.C.), assigned to the Narcotics and Special Investigations Division.

5.      Since 2007, as a law enforcement officer, I have participated in numerous drug trafficking investigations during which I have used the following investigative techniques: (1) interviewing informants and cooperating witnesses; (2) conducting physical surveillance; (3) supporting undercover operations; (4) consensual monitoring and recording of both telephonic and non-telephonic communications; (5) analyzing telephone pen register and caller identification system data; (6) conducting court-authorized electronic surveillance; and (7) preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.  I have also applied for federal wire and electronic intercepts; listened to court-authorized intercepted calls between individuals involved or suspected to be involved in drug trafficking activities; reviewed court-authorized text message; and interpreted court-authorized intercepted calls and text messages.

6.      I have also received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, and narcotics, white-collar, and various other crimes.

7.      In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  I have also become familiar with the ways in which narcotics traffickers use cellular telephones, cellular telephone

technology, coded communications or slang during conversations, and other means to facilitate their illegal activities and thwart law enforcement investigations.

8.     Specifically, based on your Affiant's training, knowledge, and experience, your Affiant has learned the following:

    a.   Narcotics trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, narcotics trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

    b.   Narcotics traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities.  Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

    c.   High-level narcotics traffickers commonly use multiple cellular telephones.

    d.   Cellular telephones are indispensable tools of the narcotics trafficking trade. Narcotics traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and other, similar electronic means and/or devices to maintain contact with co-conspirators and other narcotics traffickers.

    e.   Narcotics traffickers often maintain a supply of illegal drugs, items used in the manufacturing, packaging, transportation of illegal drugs, and drug proceeds inside of their residences, their vehicles, and stash locations.

    f.   Narcotics traffickers conceal contraband related to illicit activities—such as scales, packaging material, cutting agents, vacuum sealers, and other containers—in locations where they can readily access them, such as their residences, their vehicles, the residences of their friends, family members, and associates, or their drug distribution locations, such as a stash house.

    g.   Narcotics traffickers maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of narcotics for long periods of time in their residence, their vehicles, the residences of their friends, family members, and associates, or their drug distribution locations. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, passports, accounts

and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises.

h.  Conceal in their vehicles; their residences; the residences of their friends, family members and associates; their drug distribution locations; or other places over which they maintain dominion and control large quantities of United States currency, financial instruments, precious metals, jewelry, and other items of value.

i.  Narcotics traffickers take, or cause to be taken, photos of themselves, their associates, their property, and illegal contraband. Narcotics traffickers usually maintain these photos in their residence; their vehicles, the residences of their friends; family members or associates; or their drug distribution locations, such as a stash house.

j.  Drug trafficking organizations utilize the United States mail as a means of transporting narcotics and proceeds thereof to and from drug trafficking organization ("DTO") members. They use United States Priority Mail Express and Priority Mail services to ship narcotics and bulk-cash narcotics proceeds through the United States mail. Each United States Priority Mail Express and Priority Mail parcel has a distinct tracking number, and an individual with a tracking number can track the particular parcel online. Packages shipped to or from narcotics source states—such as Arizona, California, Texas, Washington, Colorado, and Florida—or territories— such as Puerto Rico—can signify that the United States Priority Mail Express and Priority Mail parcels contain narcotics or the proceeds thereof.

## **Bases of Information**

9.  The information contained in this affidavit is based upon my personal knowledge and observations as well as that of the other agents involved in this investigation. Those agents, persons with knowledge of this investigation, related those observations to me. Because I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaints and arrest and search warrants, I have not included every fact and matter observed by or made known to agents of the government. Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

**Probable Cause**

*Background Information*

10.     This is an Organized Crime Drug Enforcement Task Force investigation targeting narcotics traffickers in the several states, including Arizona, Maryland, New York, and Ohio.

11.     Based on the evidence gathered during the course of this investigation thus far, investigators believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**") **DTO** supplies others with narcotics—including, but not limited to, wholesale quantities of fentanyl, disguised as Oxycodone pills—through the United States mail.  Among the **C. ALVAREZ DTO** members who have shipped or assisted with the shipment of suspected narcotics parcels to others through the United States mail include **A. ALVAREZ**, who is **C. ALVAREZ**'s brother; **GANN**, who is **C. ALVAREZ**'s significant other; and **REYES**, who is believed to be **A. ALVAREZ**'s significant other.

12.     Investigators have identified approximately eighty (80) suspicious Priority Mail Express and Priority Mail parcels mailed through the USPS from Arizona to addresses in other states between February 2020 and December 2020.  Investigators have seized several of those Priority Mail Express parcels, and the aggregate amount of pills containing fentanyl is approximately 5,161 pills, weighing approximately 562 grams.

13.     On October 22, 2020, the Court entered an Order authorizing, inter alia, the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (602) 551-4243 used by **C. ALVAREZ** (hereinafter referred to as "**Target Telephone 1**");[1] the initial interception of wire and electronic communications occurring over the cellular

---

[1] Investigators were able to determine that **C. ALVAREZ** used **Target Telephone 1** based on the following:  Investigators (1) determined that the Arizona driver's license photograph of Carlyle Lavar Alvarez and the CCTV footage of the suspected mailer of suspicious packages discussed *infra* are the same person: **C. ALVAREZ**; (2) confirmed through Wal-Mart money

telephone assigned call number (480) 283-3767 used by **C. ALVAREZ** (hereinafter referred to as "**Target Telephone 2**");[2] and the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (240) 707-9657 used by **RANSOME** (hereinafter referred to as "**Target Telephone 3**")[3] (collectively referred to as the "Initial Wiretap").

14.     On December 2, 2020, Judge Gallagher authorized, inter alia, the renewed interception of wire communications only occurring over **Target Telephone 2** (hereinafter referred to as the "Second Wiretap").

15.     Law enforcement has ceased interception communications occurring over the Initial Wiretap and the Second Wiretap.

16.     On December 19, 2020, at approximately 1:19 a.m. (EST), four days after investigators conducted the controlled delivery as detailed *infra* Paragraphs 68 and 69, investigators stopped receiving pings from **Target Telephone 2**. Likewise, as of December 18, 2020, there were no longer communications occurring **Target Telephone 2**. Based on investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that **C. ALVAREZ** dropped **Target Telephone 2** after learning about the December 15, 2020 controlled delivery.

---

transfer transaction records that the contact telephone number listed for **C**. **ALVAREZ** was **Target Telephone 1** and video surveillance footage associated with Walmart money transfer transaction described *infra* showed **C. ALVAREZ**; and (3) know through their training, knowledge, and experience that high-level drug traffickers use multiple cellular telephones.

[2] Carlyle Alvarez is listed as the subscriber for **Target Telephone 2.**

[3] Ivan Ransome is listed as the subscriber for **Target Telephone 3.**

*C. ALVAREZ and FLOYD:  Ohio Package 1*

17.     On April 14, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Maryvale Post Office located at 4415 N. Maryvale Parkway, Phoenix, Arizona ("Maryvale Post Office") destined for 104 Broad Street, Akron, Ohio 44305, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and their listed addresses; and (3) weighed approximately six ounces (hereinafter referred to as "**Ohio Package 1**").

18.     The following is an image of **C. ALVAREZ,** holding a United States Mail parcel in each of his hands, from the CCTV footage of the Maryvale Post Office's lobby area:



19.     On April 15, 2020, Honorable Kathleen B. Burke, United States Magistrate Judge for the Northern District of Ohio, issued a search warrant, authorizing the search of **Ohio Package 1** (hereinafter referred to as the "April 15, 2020 warrant").  On the same day, Ohio Postal Inspectors searched **Ohio Package 1** pursuant to April 15, 2020 warrant.  They recovered 500 light blue pills containing fentanyl and weighing approximately 55 grams in the aggregate from inside **Ohio Package 1**.  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

20.    **Ohio Package 1** was scheduled for delivery on April 15, 2020, by 3:00 p.m., to 104

Broad Street, Akron, Ohio 44305, if law enforcement had not seized **Ohio Package 1**.

21.    On **Ohio Package 1**'s expected delivery date, **FLOYD**, via (330) 880-1760,[4]

contacted the USPS customer service center regarding the delivery status of **Ohio Package 1**.

During the telephone call, **FLOYD** identified himself as Mr. Sawhill, which is consistent with the

listed recipient's last name for **Ohio Package 1**.  **FLOYD** also provided the following information

to the USPS customer service representative during the call:   tracking number (*i.e.*,

EK466006747US), delivery address (*i.e.,* 104 Broad Street, Akron, Ohio 44305), recipient's first

and last names (*i.e.*, Brian Sawhill), and return telephone number (*i.e.*, (234) 738-8554).

Additionally, in response to the USPS customer service representative inquiry about his well-

being, **FLOYD** stated, "I'm doin alright, um, my grandson sent me something from Arizona and

I had the tracker on it, and it said it should have been here by three and here it is it's almost seven

o'clock."

22.    Based on my training, knowledge, and experience, including my involvement in

this investigation, I believe that **FLOYD** (i) was the intended recipient of **Ohio Package 1**

containing fentanyl; and (ii) provided the fictitious last name listed on **Ohio Package 1** to the

USPS customer service representative to identify himself as the intended recipient (and thus be

---

[4] Investigators were able to determine that **FLOYD** used (330) 880-1760 based on the
following:  Lavelle Floyd is the subscriber name and 2281 11th Street, SW, Akron, Ohio, 44314—
**Ohio Package 2**'s delivery location—as the subscriber's address for (330) 880-1760; a search of
law enforcement databases reflect that Lavelle is the middle name of Courtney Floyd; **FLOYD**
provided (330) 880-1760 as his telephone number to law enforcement during a January 2018
incident regarding a stolen vehicle; and as recent as June 2020, the police responded to 2281 11th
Street, SW, Akron, Ohio, 44314—the residence that **FLOYD** shared with his girlfriend and his
stepdaughter, who is the alleged victim and the daughter of **FLOYD**'s girlfriend—regarding a
molestation claim against **FLOYD**.

able to check on **Ohio Package 1**'s delivery status) and concealed his true identity from law enforcement to the extent law enforcement had seized the fentanyl from **Ohio Package 1**.

*C. ALVAREZ and RANSOME:  Maryland Package 1*

23.     On April 16, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Capitol Post Office located at 2 S. 35th Avenue, Phoenix, Arizona 85009 destined for the **Target Premises**, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's name and listed addresses; and (3) weighed approximately eleven ounces (hereinafter referred to as "**Maryland Package 1**").  **Maryland Package 1** was delivered on April 17, 2020, at 12:25 p.m.

24.     Notably, the sender's name and address listed on **Maryland Package 1** are the same as the sender's name and address listed on **Ohio Package 1**.

25.     On April 17, 2020, the same day as **Maryland Package 1**'s delivery, at approximately 6:09 p.m., **RANSOME** sent a $2500.00 money transfer in the Walmart located at 17850 Garland Groh Boulevard, Hagerstown, Maryland, 21740 (hereinafter referred to as "Hagerstown Walmart") to **C. ALVAREZ**.  On the same day, about six minutes after **RANSOME** sent the $2500.00 money transfer, **C. ALVAREZ** picked up the $2500.00 money transfer at the Walmart located at 7975 W Peoria Avenue, Peoria, Arizona, 85345 (hereinafter referred to as "Peoria Walmart Supercenter").  **C. ALVAREZ** became angry about answering questions regarding the $2,500.00 money transfer transaction.

26.     The following on the left is an image of **RANSOME**, sending the $2500.00 money transfer, from Hagerstown Walmart video surveillance footage while the following on the right is an image of **C. ALVAREZ**, picking up the $2500.00 money transfer, from Peoria Walmart Supercenter video surveillance footage:



27.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that (i) **Maryland Package 1** contained narcotics; (ii) **RANSOME** (a) received **Maryland Package 1** delivered to **Target Premises**; and (b) traveled to the Hagerstown Walmart to pay **C. ALVAREZ** for the narcotics in **Maryland Package 1**, that **C. ALVAREZ** supplied to **RANSOME** through the United States mail; and (iii) **C. ALVAREZ** retrieved the $2500.00 in drug proceeds from the Peoria Walmart Supercenter.

*C. ALVAREZ and FLOYD:  Mailing of Ohio Package 2*

28.     On April 21, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Peoria Downtown Post Office located at 10700 N. 85th Avenue, Peoria, Arizona 85345 ("Peoria Downtown Post Office") destined for 2281 11th Street, SW, Akron, Ohio 44314—an address previously associated with **FLOYD**—with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and listed addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**Ohio Package 2**").

29.     The following is an image of **C. ALVAREZ**, handling the cash transaction for **Ohio Package 2**'s shipment, from the CCTV footage of the Peoria Downtown Post Office's transaction counter area:

11



30.     On April 22, 2020, United States Magistrate Judge Burke issued a search warrant, authorizing the search of **Ohio Package 2** (hereinafter referred to as the April 22, 2020 warrant"). On the same day, Ohio Postal Inspectors searched **Ohio Package 2** pursuant to the April 22, 2020 warrant.  They recovered 201 light blue pills, containing fentanyl and weighing approximately 22 grams in the aggregate, from inside of **Ohio Package 2.**  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

31.     The toll data from **Ohio Package 2**'s delivery date reflects a substantial amount of communications between **C. ALVAREZ**, via **Target Telephone 1**, and **FLOYD**, via (330) 880-1760, from approximately 12:12 p.m. to 8:22 p.m.  Specifically, the toll data shows that **FLOYD**, via (330) 880-1760, made an outgoing telephone call to **C. ALVAREZ**, via **Target Telephone 1**, at approximately 12:12 p.m.  That call lasted for approximately seven minutes and twenty-eight seconds.  The toll data further shows that, several minutes after that call concluded, **C. ALVAREZ**, via **Target Telephone 1**, sent **FLOYD**, via 330-880-1760, six IM chat messages.  The toll data also reflects that **FLOYD**, via 330-880-1760, made an outgoing telephone call to **C. ALVAREZ**, via **Target Telephone 1**, at approximately 2:37 p.m.  That call lasted for approximately forty seconds.  The toll data further reflects that **FLOYD**, 330-880-1760, received eight IM chat

messages from **ALVAREZ**, **Target Telephone 1**, between 5:12 p.m. and 6:02 p.m.  The toll data also reflects that **FLOYD**, via (330) 880-1760, received an incoming telephone call from **C. ALVAREZ**, via **Target Telephone 1**, at approximately 8:22 p.m.   That call lasted for approximately 2 minutes and twenty-two seconds.

32.    Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, **FLOYD** was the intended recipient of **Ohio Package 1** containing fentanyl.

*C. ALVAREZ and RANSOME:  Mailing of Maryland Package 2*

33.    On May 15, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Peoria Downtown Post Office destined for  the **Target Premises** with the following characteristics: (1) a return address in Peoria, Arizona; (2) no association between the sender's and recipient's listed addresses; and (3) weighed approximately twenty ounces (hereinafter referred to as "**Maryland Package 2**").

34.    The following is an image of **C. ALVAREZ** at the transaction counter from the CCTV footage of the Peoria Downtown Post Office's counter area:



35.    On May 26, 2020, Honorable Timothy J. Sullivan, United States Magistrate Judge for the District of Maryland, issued a warrant, authorizing the search of **Maryland Package 2** (hereinafter referred to as the "May 26, 2020 warrant").  On the same day, investigators searched **Maryland Package 2** pursuant to the May 26, 2020 warrant.  They recovered 4,015.5 light

blue/green pills, containing fentanyl and weighing approximately 437 grams in the aggregate, from inside of **Maryland Package 2**.

36.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, **RANSOME** was the intended recipient of **Maryland Package 2** containing fentanyl.

*GANN:  New York Package 1*

37.     On October 28, 2020, at approximately 1:11 p.m. (MST), investigators observed Maria Alvarez depart from 2323 N. 39th Avenue, Peoria, Arizona, 85345.  Several minutes later, the 2014 silver Infiniti Q50 bearing Arizona license plate number CJF5249 registered to Jennifer Jean Gann and Carlyle Lavar Alvarez, 8927 W Purdue Avenue, Peoria, Arizona, 85345 (hereinafter referred to as "**C. ALVAREZ's Vehicle**") departed from the front area of 2321 N. 39th Avenue, Phoenix, Arizona 85009 (hereinafter referred to as "**C. ALVAREZ and GANN's residence**").  **GANN** was the driver of **C. ALVAREZ's Vehicle**; **C. ALVAREZ** was the front-seat passenger of **C. ALVAREZ's Vehicle**; and two children were in the back seat of **C. ALVAREZ's Vehicle.**

38.     Investigators followed **C. ALVAREZ's Vehicle** from the front area of **C. ALVAREZ and GANN's residence** to the Maryvale Post Office and observed **C. ALVAREZ** and **GANN,** carry envelopes that matched the description of Priority Mail flat rate envelope(s), into the Maryvale Post Office.

39.     In the Maryvale Post Office, **GANN** mailed a Priority Express Mail parcel destined to 2537 Church Avenue, Apartment 3R, Brooklyn, New York, 11226, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's

and recipient's names and addresses; and (3) weighed approximately six ounces (hereinafter referred to as "**New York Package 1**").

40.      On November 5, 2020, Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued a warrant, authorizing the search of **New York Package 1** (hereinafter referred to as "New York November 5, 2020 warrant").  On the same date, New York Postal Inspectors searched **New York Package 1** pursuant to the New York November 5, 2020 warrant.  They recovered approximately 496 light blue pills—one of which field-tested positive for fentanyl—from inside **New York Package 1**.  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.  The drug analysis for those pills are pending.

*C. ALVAREZ and FLOYD: Ohio Package 3*

41.      In the Maryvale Post Office, around the same time that **GANN** mailed **New York Package 1**, **C. ALVAREZ** mailed a Priority Express Mail parcel destined to 410 Locust Street, Apartment 102, Akron, Ohio, 44307 (alternatively referred to as "Apartment 102") with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and their listed addresses; and (3) weighed approximately three ounces (hereinafter referred to as "**Ohio Package 3**").

42.      Within minutes of **C. ALVAREZ**'s mailing of **Ohio Package 3**, **C. ALVAREZ**, via **Target Telephone 1**, made an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During their discussion, **C. ALVAREZ** asked, "What's the the one (1), O', two (2) for?" to which **FLOYD** responded, "That's the um- apartment number." **C. ALVAREZ** then asked, "Apartment number, bro'?" **FLOYD** then confirmed so: "Yeah." Before the call ended, **C. ALVAREZ** said, "One (1), O', two (2). A'ight. Akron, Ohio, Four (4) ten (10) Lotus Street [PH], uh one (1), O', two (2)."

Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that **C. ALVAREZ** confirmed in vague, coded language the address to which **C. ALVAREZ** mailed **Ohio Package 3**.

43.    On October 29, 2020, at approximately 12:47 p.m., **Ohio Package 3** was delivered.

44.    On the same day, at approximately 5:10 p.m., **FLOYD** exited Apartment 102, opened a mailbox, retrieved a white envelope, and eventually returned to Apartment 102 with the white envelope.

45.     Based on my training, knowledge, and experience, including my involvement in this investigation, (i) **FLOYD** (a) was the intended recipient of **Ohio Package 3**; and (b) retrieved **Ohio Package 3** from Apartment 102's mailbox; and (ii) **Ohio Package 3** contained narcotics.

*Narcotics Payments to C. ALVAREZ*

46.    During the Initial Wiretap, investigators learned that **C. ALVAREZ** also provided a narcotics customer with information for a cash app account—"$sweetness8225—believed to be maintained by **GANN**, to deposit payments for narcotics previously supplied by **C. ALVAREZ**. Pertinent intercepted communications are as follows:

    a.    On October 24, 2020, at approximately 6:51 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming call from **Unknown Male** ("**UM**"), via (717) 710-1543.  Here is an excerpt of their discussion:

    **C. ALVAREZ**: Yo?

    **UM**: Yo, yo, uhm...yeah man, this nigga, I gotta [sic] fire [PH] him.  He sometimes-motherfuckers tell you want you want to hear, that's the...but, here is the thing.  He had called me back like an hour later, he was like, it got like a harsh...like, taste to it.

Based on information obtained during the course of this investigations, as well as my, training, knowledge, and experience, I believe that **C. ALVAREZ** previously supplied **UM** with narcotics; and **UM** in vague, coded language provided **C. ALVAREZ** with feedback about those narcotics' quality (*i.e.*, "It got like a harsh...like taste to it.")

       b.      On November 2, 2020, at approximately 12:22 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming telephone call from **UM**, via (717) 710-1543.  Here is an excerpt of their discussion:

> **C. ALVAREZ:** You-you busy?
>
> **UM**: A little-a-a-little bit.  I gotta take her to work.
>
> **C. ALVAREZ**: A'ight, 'c-'cause-a'ight.  I need 'ju to send me fifteen-hunnit, (1,500), bro'-bro'.
>
> **UM**: A'ight.  How I'mma do that?
>
> **C. ALVAREZ**: [PAUSE] Western Union, CashApp, or Zelle.

Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe that, in vague, coded language (i) **C. ALVAREZ** requested **UM** to pay soon a minimum amount of $1,500.00—(*i.e.*, fifteen-hunnit")—towards **UM**'s narcotics debt owed to **C. ALVAREZ**; (ii) **UM** agreed to do so—(*i.e.*, "A'ight"); (iii) **UM** inquired how **C. ALVAREZ** wanted **UM** to make the narcotics payment—(*i.e.*, "How I'mma do that"); and (iv) **C. ALVAREZ** instructed the **UM** to use any of the following currency transfer services—(*i.e.*, Western Union, CashApp, Zelle).

       c.      On November 2, 2020, between approximately 12:25 p.m. and 12:28 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, sent two outgoing text messages to **UM**, via

(717) 710-1543, that read: "$sweetness8225," and "Jennifer Jean gann," respectively. Based on investigators' training, knowledge, and experience, including their experience in this investigation, investigators believe that **C. ALVAREZ** texted "$sweetness8225," to the **UM** to identify the profile name of the Cash App account where **C. ALVAREZ** wanted the **UM** to deposit the $1,500.00 narcotics payment, and sent the follow-up text "Jenifer Jean gann," to identify the individual who maintained that account: **GANN**.

d.      On the next day, at approximately 12:43 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing telephone call to **GANN**, via (602) 503-8502.[5] Here is their full discussion:

**C. ALVAREZ**: Hello, baby.

**GANN**: We don't got no cash, babe.

**C. ALVAREZ**: Babe, you call for that, babe?

**GANN**: Well I'm telling you. Are you gonna [sic] have them send something?

**C. ALVAREZ**: Babe, you calling for that, baby?

**GANN**: A'right. a'right, I'm almost there.

**C. ALVAREZ**: A'right.

**GANN**: I just-

Based on my training, knowledge, and experience, including my involvement in this investigation, investigators believe in vague, coded language, that (i) **GANN** (a) told **C. ALVAREZ** that **GANN** has not received the expected narcotics payments through **GANN**'s Cash App account; and (b) requested that **C. ALVAREZ** contact the individuals whom **C. ALVAREZ**

---

[5] Jennifer J. Gann is listed as the subscriber for (602) 503-8502.

supplies with narcotics to pay their drug debt owed to **C. ALVAREZ**, so **GANN** and **C. ALVAREZ** could have money; (ii) **C. ALVAREZ** expressed his displeasure with **GANN** discussing narcotics-related matters over the telephone; and (iii) **GANN** advised **C. ALVAREZ** that **GANN** was near **C. ALVAREZ**'s location.

*GANN and FLOYD:  Ohio Package 4*

47.    On November 3, 2020, at approximately 1:45 p.m. (MST), approximately one hour after **GANN** asked **C. ALVAREZ** to contact those whom **C. ALVAREZ** supplied with narcotics to pay their narcotics debt, investigators observed **C. ALVAREZ**, carrying what appeared to be a plastic shopping bag, and **GANN** exit **C. ALVAREZ** and **GANN**'s residence.  **GANN** entered the driver's seat of **C. ALVAREZ's Vehicle**, and **C. ALVAREZ** entered the front passenger seat of **C. ALVAREZ's Vehicle**.  Shortly after, **GANN**, driving **C. ALVAREZ's Vehicle**, left that area.

48.    Investigators followed **C. ALVAREZ's Vehicle**, but they eventually lost sight of **C. ALVAREZ's Vehicle** during surveillance.  However, at approximately 2:48 p.m. (MST), GPS/PLI data reflected that **Target Telephone 1** was in the area of 8155 N Canyon Highway, Phoenix, Arizona, 85021.

49.    Investigators traveled to the Washington Post Office located at 8155 N. Canyon Highway, Phoenix, Arizona 85021 ("Washington Post Office") and observed **C. ALVAREZ's Vehicle** parked in the Washington Post Office's parking lot.  And an Arizona Postal Inspector observed **C. ALVAREZ** at the USPS customer counter of the Washington Post Office.

50.    **GANN** mailed a Priority Mail Express parcel to 410 Locust Street, Apartment 102, Akron, Ohio, 44307 with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between sender's and recipient's last name and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**Ohio Package 4**").

51.     The following is an image of **GANN** at the transaction counter from the CCTV footage of the Washington Post Office's counter area:



52.     Later on **Ohio Package 4**'s mailing date, **C. ALVAREZ**, via **Target Telephone 1**, made an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During that call, **C. ALVAREZ** said, "Yeah, that's in the air," and subsequently followed up, "You heard me?" **FLOYD** responded, "Si."  Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that (i) **C. ALVAREZ** in vague, coded language, confirmed that the narcotics inside of **Ohio Package 4** were mailed to 410 Locust Street, Apartment 102, Akron, Ohio, 44307, for **FLOYD**; and (ii) **FLOYD** acknowledged that he understood.

53.     On the next day, at approximately 1:35 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 1**, placed an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During their call, **FLOYD** said, "Man, they are trying to find the package.  That motherfucker never even made it here, man. . . . .So, now they trying to track down the damn whole package."  **C. ALVAREZ** then asked, "So, how is it hittin' the alert and all that?"  **FLOYD** replied, "Hitin' the alert. . . . But

one of this other carriers got it."  **C. ALVAREZ** then said, "Yeah, of course, my nigga."  Based on my training, knowledge, and experience, as well as information obtained during the course of this investigation, I believe that, in vague, coded language, (i) **FLOYD** (a) told **C. ALVAREZ** that **Ohio Package 4** had not arrived yet; and (b) USPS postal workers were trying to locate **Ohio Package 4**.

54.      On November 5, 2020, United States Magistrate Judge Burke issued a warrant, authorizing the search of **Ohio Package 4** (hereinafter referred to as the "Ohio November 5, 2020 warrant").   On the same day, investigators searched **Ohio Package 4** pursuant to the Ohio November 5, 2020 and recovered 200 light blue/green pills, containing fentanyl and weighing approximately 21 grams in the aggregate, from inside **Ohio Package 4**.  Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

*C. ALVAREZ:  New Jersey Package 1*

55.      In the Washington Post Office shortly after **GANN** mailed **Ohio Package 4**, **C. ALVAREZ** mailed a Priority Mail Express parcel to 126 Clifton Place, Apartment 1008, Jersey City, New Jersey, 07304, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**New Jersey Package 1**").

56.      The following is an image of **C. ALVAREZ** at the transaction counter from the CCTV footage of the Washington Post Office's counter area:



57.     On November 6, 2020, Honorable Michael T. Morrissey, United States Magistrate Judge for the District of Arizona, issued a warrant, authorizing the search of **New Jersey Package 1** (hereinafter referred to as the New Jersey November 6, 2020 warrant").  On the same day, Arizona Postal Inspectors searched **New Jersey Package 1** and recovered approximately 200 light green pills—that field-tested positive for Acetaminophen—from inside **New Jersey Package 1**. Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.  The drug analysis for those pills are pending.

*C. ALVAREZ, A. ALVAREZ, REYES, and MIDDLETON:*
*The New York Packages*

58.     During the Second Wiretap, investigators learned about an approximately two kilogram quantity of cocaine transaction involving **C. ALVAREZ** and **MIDDLETON** as well as the shipment of the same involving **A. ALVAREZ** and **REYES**.

59.     On December 7, 2020, at approximately 4:43 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming call from **MIDDLETON**, via (602) 367-0956.[6]  Here is an excerpt of their discussion:

---

[6] As discussed *infra* Paragraph 69, law enforcement seized the cellular telephone assigned call number (602) 367-0956 that belonged to **MIDDLETON** from the couch on the ground floor of the **New York Packages**' delivery.

**MIDDLETON**: Yeah, what I was trynna [sic] say, Chi, call your boy to see if he's good because I'm trynna fuck with these niggas. These niggas got me stressed out over that little two-fifty (250), you know?

**C. ALVAREZ**: Yeah. [BACKGROUND: UC VOICE][VOICES OVERLAP].

**MIDDLETON**: Damn, man. Let's see if we got options. 'Cause if it wasn't for homie I wouldn't even be ready, you know?

**C. ALVAREZ**: Yeah.

**MIDDLETON**: Yeah, let's see if they- if they Gucci. Let's see if- what they number- if not...

**C. ALVAREZ**: Alright, I'm wondering if I could call now.

**MIDDLETON**: And yeah, two (2). Just see what the number is or, you know?

**C. ALVAREZ**: Yeah. [VOICES OVERLAP]

**MIDDLETON**: I don't really wanna [sic] deal with them with these numbers they talkin' 'bout. They not playing fair. These niggas not respecting every time I come, I'm coming up more, more, and more, you know?

**C. ALVAREZ**: [BACKGROUND: UC VOICE] Yeah.

**MIDDLETON**: Ain't respecting shit, so. [PAUSE] Let's check. But, I'm here, bro'.

**C. ALVAREZ**: A'ight.

Based on my training, knowledge, and experience, including my experience in this investigation, I believe that, in vague, coded language, (1) **MIDDLETON** (i) asked **C. ALVAREZ** to contact narcotics suppliers for quotes for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) **MIDDLETON** expressed her dissatisfaction with the price quoted for the amount of narcotics that **MIDDLETON** was purchasing—(*i.e.*, "I don't really

23

wanna [sic] deal with them with these numbers they talkin' bout.  They not playing fair."); and (iii) **MIDDLETON** believed she should receive a lower price for the narcotics due to **MIDDLETON** continually purchasing additional narcotics—(*i.e.*, "I'm coming up more, more, and more"); and (2) **C. ALVAREZ** agreed to do as **MIDDLETON** requested.

60.    On December 7, 2020, at approximately 4:50 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing telephone call to **MIDDLETON**, via (602) 367-0956. Here is an excerpt of their discussion:

> **C. ALVAREZ**: Uh, I'm waiting for a call back from the homie and then I just finished speaking to uh, Ice Cream Man.
>
> **MIDDLETON**: And what he talkin' 'bout?
>
> **C. ALVAREZ**: He said thir- he said thirty-four (34). He know for sure it's- it's- it's a hundred (100%) percent- it's a hundred (100%) percent- it could float and it could melt.
>
> [VOICES OVERLAP]
>
> **MIDDLETON**: That's what we gotta [sic] make sure, 'cause that's what these niggas think- that somebody on them that like- yo, I'm telling you, I'm a little mad. I'm stressed, bro'. Super stressed, but I'm with you, you know?
>
> **C. ALVAREZ**: Yeah.
>
> **MIDDLETON**: Yeah, I tell- I gotta chop it with you, soon as I pull up.

Based on investigators' training, knowledge, and experience, including their experience during the course of this investigation, investigators believe that **C. ALVAREZ**, in vague, coded language, (i) confirmed with **MIDDLETON** that **C. ALVAREZ** spoke with a narcotics supplier, who provided a quote—(*i.e.*, thirty-four)—for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) confirmed the quality of those narcotics—(*i.e.*, "it could float

24

and it could melt.").  Based on my training, knowledge, and experience, including my experience during the course of this investigation, I further believe that **MIDDLETON** stated that **MIDDLETON** and **C. ALVAREZ** (i) must ensure that those narcotics are of the quality that they desired—(*i.e.*, "That's what we gotta [sic] make sure"); and (ii) will discuss **MIDDLETON** and **C. ALVAREZ**'s narcotics trafficking activities further in person—(*i.e,* "I gotta chop it with you, soon as I pull up.").

61.     On December 9, 2020, pole camera footage reflects that, between approximately 12:41 and 12:43 p.m. (MST), **REYES** and **A. ALVAREZ** exited 2323 N. 39th Avenue, Phoenix, Arizona 85009 ("2323 N. 39th Avenue"), enter a dark sedan, and drove away from 2323 N. 39th Avenue.  The pole camera footage further reflects that, a little over thirty minutes later, (i) the dark sedan (a) returned and (b) was parked in the shared driveway of 2323 N. 39th Avenue and 2325 N. 39th Avenue, Phoenix, Arizona 85009; and (ii) **REYES** and **A. ALVAREZ** exited the dark sedan.  The pole camera footage also reflects that **A. ALVAREZ** (i) subsequently removed at least two empty brown boxes from the passenger area of the dark sedan; and (ii) carried the empty brown boxes into 2323 N. 39th Avenue**.**

62.     On the same day, pole camera footage reflects that, between approximately 1:45 p.m. and 1:48 p.m. (MST), **A. ALVAREZ**, carrying a total of two boxes one at a time, and **REYES**, carrying one box, exited 2323 N. 39th Avenue; walked to the dark sedan parked on the west side of 2323 N. 39th Avenue; and placed those boxes into the dark sedan.  The pole camera footage further reflects that, at approximately 1:48 p.m. (MST), **MIDDLETON** exited 2323 N. 39th Avenue; **A. ALVAREZ**, **REYES**, and **MIDDLETON** eventually entered the dark sedan; and the dark sedan departed from the west side of 2323 N. 39th Avenue.

63.     At approximately 2:07 p.m. (MST), **REYES**, carrying two boxes, and **A. ALVAREZ**, carrying one box, entered the Osborn Post Office located at 3905 North Seventh Avenue, Phoenix, Arizona 85013 ("Osborn Post Office").

64.     Additionally, between approximately 2:31 p.m. (MST) and 2:39 p.m. (MST), **REYES** handed two Priority Express Mail parcels destined for 116-50 Lincoln Street, South Ozone Park, New York, 11420 (hereinafter referred to as the "**New York Packages**") to a USPS associate at the transaction counter for shipment and paid shipping costs of the **New York Packages**; and (ii) **A. ALVAREZ** obtained the change from that cash transaction.

65.     The following on the left is an image of **A. ALVAREZ** and **REYES**, waiting together with boxes, from the CCTV footage of the Osborn Post Office while the following on the right is an image of **A. ALVAREZ** and **REYES** at the transaction counter from the CCTV footage of the Osborn Post Office:



66.     During the Second Wiretap, **C. ALVAREZ** followed up on the **New York Packages**.   For instance, on December 11, 2020, at approximately 2:13 p.m. (MST), **C. ALVAREZ**, via **TT-2**, made an outgoing to telephone call to **MIDDLETON**, via (602) 367-0956.  Here is an excerpt of their discussion:

**C. ALVAREZ**: That shit in hand?

**MIDDLETON**: Nah, it's- it's still saying, it ain't say, "Out for delivery," yet. It- it say it's on that side, though.

Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe in vague coded language (i) **C. ALVAREZ** called **MIDDLETON** to determine if the **New York Packages** had been delivered (*i.e.*, "That shit in hand"); and (ii) **MIDDLETON** (a) confirmed that the **New York Packages** had not been delivered; and (b) indicated that **MIDDLETON**, or someone at **MIDDLETON's** direction, checked the **New York Packages**' delivery status.

67.     On December 14, 2020, Honorable Lois Bloom, United States Magistrate Judge for the Southern District of New York, issued a warrant, authorizing the search of the **New York Packages** (hereinafter referred to as the "December 14, 2020 warrant").   On the same day, Postal Inspectors searched the **New York Packages** pursuant to the December 14, 2020 warrant and recovered approximately one kilogram of cocaine in each of the **New York Packages**.

68.     On December 15, 2020, United States Magistrate Judge Bloom issued two warrants—one, authorizing the tracking of the **New York Packages** ("December 15, 2020 tracking warrant"); and two, authorizing the search of premises in which the **New York Packages** were opened ("December 15, 2020 residential warrant").   Later on the same day, at approximately 4:12 p.m. (EST), USPIS, Homeland Security Investigations, and the New York City Police Department conducted a controlled delivery at the **New York Packages'** delivery address.   During the delivery, a USPIS Inspector, working in an undercover capacity, delivered the **New York Packages** to **MIDDLETON** at the front door of the **New York Packages'** delivery address, although **MIDDLETON** does not rent or own the residence.

69.     After receiving an alert from one of the trip devices installed inside of the **New York Packages**, pursuant to the December 15, 2020 tracking warrant, law enforcement entered

the **New York Packages'** delivery address pursuant to the December 15, 2020 residential warrant. During the December 15, 2020 residential warrant execution, law enforcement observed **MIDDLETON** on the ground floor.  Among the items that law enforcement seized was a black Samsung Galaxy, Model No. SM-A015AZ, bearing IMEI No. 351721112380809, belonging to **MIDDLETON** ("**MIDDLETON's cellphone**") from the **New York Packages**' delivery address.

70.    On December 29, 2020, Honorable Thomas M. DiGirolamo, United States Magistrate Judge for the District of Maryland, issued a warrant authorizing the search of, inter alia, **MIDDLETON**'s cellphone.

71.    During a search of **MIDDLETON's cellphone**, investigators learned that **MIDDLETON**'s cellphone is assigned the cellular telephone assigned call number (602) 367-0956.

72.    Investigators also discovered during the search of **MIDDLETON's cellphone** that, (i) at approximately 1:08 p.m. (MST), on the day immediately after **C. ALVAREZ** followed up with **MIDDLETON** about **New York Packages**' delivery status, **REYES**, via (843) 694-9763,[7] provided **MIDDLETON**, via (602) 367-0956, with a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (ii), on December 15, 2020, at approximately 10:22 a.m. (MST) **REYES**, via (843) 694-9763, sent the following instant message to **MIDDLETON**, via (602) 367-0956:  "Good morning, says out for delivery."  Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that

---

[7] Investigators were able to determine that **REYES** used (843) 694-9763 based on the following: (1) Investigators determined that a comparison of the Arizona driver's license photograph of Millie Reyes, as well as other information obtained during the course of this investigation, and the image from CCTV footage of the **New York Packages**' mailer discussed *supra* are the same person: **REYES**; (2) **MIDDLETON's cellphone** received a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (3) (843) 694-9763 is listed under Millie, the first name of **REYES**, in **MIDDLETON's cellphone.**

REYES alerted **MIDDLETON** that the **New York Packages** containing approximately two kilograms of cocaine would be delivered that day.

73.     Investigators further learned, on December 15, 2020, at approximately 2:46 p.m. (MST) that **MIDDLETON** received an incoming call from **A. ALVAREZ**, via (602) 644-6144,[8] lasting for 0 seconds.   Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, based on the timing of the communication, **A. ALVAREZ** contacted **MIDDLETON** to follow up about **MIDDLETON**'s receipt of the **New York Packages** containing approximately two kilograms of cocaine.

74.     Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe that **MIDDLETON** (i) traveled to Phoenix, Arizona, to coordinate a multi-kilogram cocaine transaction; (ii) was the intended recipient of the approximately two kilograms of cocaine seized from the **New York Packages**; and (iii) was at the **New York Packages**' delivery address to (a) oversee the delivery of the **New York Packages'**; and (b) take custody of the approximately two kilograms of cocaine that were originally inside of the **New York Packages**.

*The Target Premises*

75.     **Target Telephone 3** is subscribed to **RANSOME**, and the **Target Premises** is listed as the subscriber's address.

76.     During the Initial Wiretap, **RANSOME** discussed narcotics belonging to **C. ALVAREZ** that **C. ALVAREZ** intended to supply to **A. ALVAREZ**, and were stolen from the **Target Premises**.   Specifically, on October 23, 2020, at approximately 9:50 a.m. (EST),

---

[8] A Square, Inc. subpoena return for an account maintained by **A. ALVAREZ** identified (602) 644-6144 as the telephone number for **A. ALVAREZ**.

**RANSOME**, via **Target Telephone 3**, received an incoming telephone call from **Jack Peele**, via

(813) 543-7178.[9]  Here is an excerpt of their discussion:

> **RANSOME**: So, when I spoke to him the other day. I got a little five thousand (5,000) for him. I'm like...
>
> **PEELE**: Uh-huh.
>
> **RANSOME**: "Nigga, you took all the fucking work." I said, nigga left me with a thousand pills. I said, "After I pay my bills, and if I send you five thousand dollars, nigga. I'm broke. You think I'm about to be broke? [U/I], nigga. . . .
>
> **RANSOME**: So, he had bought them pills for Antoine. Right?
>
> **RANSOME**: [U/I] Antoine get the pills [U/I]. So, when they broke into my crib, they stole all that shit.
>
> **PEELE**: Right.
>
> **RANSOME**: This nigga thought, this niggas was thinking probably, 'cause to tell you the truth, he got [U/I] between the lines. He probably thought I robbed him. He like, "Yo. You got over." "Got over?" I said, "Nigga, I took the biggest lost. Fuck is you talking about?"
>
> **PEELE**: Oh, he's saying like you set up the robbery [LAUGHS]...

Based on information obtained during the course of this investigation, as well as my

training, knowledge, and experience, I believe in vague, coded language **RANSOME** vented to

**PEELE** about **C. ALVAREZ** (i) leaving **RANSOME** with 1,000 fentanyl pills only; (ii)

requesting **RANSOME** to send **C. ALVAREZ** $5,000.00 in drug proceeds, which would leave

**RANSOME** without any money after **RANSOME** paid **RANSOME**'s bills; and believing that

---

[9] Law enforcement identified (813) 543-7178 as belonging to **PEELE** through, in part, a Walmart money transfer transaction that **PEELE** sent to **C. ALVAREZ** on April 6, 2020. Investigators obtained records from Walmart that confirmed that, on April 6, 2020, at approximately 5:54 p.m., **PEELE** sent **C. ALVAREZ** a $200.00 money transfer from a Walmart located at 1355 E Lehman Street Lebanon, Pennsylvania 17046 ("Lebanon Walmart").  The primary photo ID type for the $200.00 money transfer transaction sent by **PEELE** to **C. ALVAREZ** matches **PEELE'**s Pennsylvania driver's license number.

**RANSOME** played a part in the fentanyl pills, including those belonging to **C. ALVAREZ** that **C. ALVAREZ** intended to supply to **A. ALVAREZ**, being stolen from the **Target Premises**.

77.     During the Initial Wiretap, **Target Telephone 3** regularly pinged overnight in the vicinity of the **Target Premises**.

78.     On November 9, 2020, a non-fatal overdose victim reported to the Hagerstown Police Department that the victim purchased drugs from Ivan Ransome of 42 East Avenue, Apartment 1E.

79.     As recent as January 4, 2021, I observed **RANSOME**'s vehicle—2014 silver Mercedes Benz bearing Virginia license plate number 31752HM and Vehicle Identification Number WDDSJ4GBXEN106606, registered to Ivan  A. Ransome, 32 E Washington Street, Apartment 1, Hagerstown, Maryland, 21740—parked in the rear of the **Target Premises**.

80.     As recent as January 8, 2021, at approximately 11:38 a.m., investigators observed RANSOME exit the front entrance of 42 East Avenue, Hagerstown, Maryland 21740—the building in which the **Target Premises** is located—and proceeded directly to **RANSOME**'s vehicle that was located at the curb directly across the street from the **Target Premises**; enter **RANSOME**'s vehicle; and drive away.

<u>**Conclusion**</u>

81.     Based on the foregoing, your affiant submits that there is probable cause to believe that **C. ALVAREZ**, **GANN**, **A. ALVAREZ**, **REYES**, **FLOYD**, **MIDDLETON**, and **RANSOME** are engaging in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) the **Target Premises** contains fruits, evidence, and instrumentalities of drug trafficking activities, including those items listed in Attachment B.

82.     Accordingly, your Affiant respectfully requests the issuance of the requested criminal complaints and arrest warrants.  Your Affiant further requests a search warrant for the **Target Premises**, as fully described in Attachment A, for the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of drug trafficking activities in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and the seizure of the items listed in Attachment B.

Respectfully submitted,

Derek Starliper, Inspector
U.S. Postal Inspection Service

Affidavit submitted by e-mail and attested to me as accurate by telephone consistent with Fed. R. Crim. Proc. 4(d), 4.1, and 41(d)(3) this _11_ day of January, 2021

Honorable Thomas M. DiGirolamo
United States Magistrate Judge

32

## Attachment A:  The Target Premises

The property to be searched is 42 East Avenue, Apartment 1E, Hagerstown, Maryland, 21740 (hereinafter referred to as the "**Target Premises**").  The building containing the **Target Premises** is described as follows:  a three-story painted brick apartment building.  The front entry door to the building is glass with brown trim.  The number "42" is affixed to a porch column in the front of the building.

Photographs of the building containing the **Target Premises** are as follows:



The apartment door for the **Target Premises** is inside the building on the first floor.  The door to the **Target Premises** is brown with a glass window, and has a black metal mailbox on the front of the door with the label "APT 1E."

Photographs of the door to the **Target Premises** are as follows:



## Attachment B:  Items to be Seized From the Target Premises

This warrant authorizes the search and seizure of items relating to the violations of 21

U.S.C. §§ 841, 843(b), and 846, by Ivan Augustus Ransome and his known and unknown co-

conspirators, including, but not limited to, the following:

1.      Controlled substances.

2.      Records of narcotics transactions, including, but not limited to, books; ledgers; receipts; notes; pay and owe sheets; and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics.

3.      Financial records and other documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; pre-paid credit cards; green dot cards; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes; keys to safe deposit boxes; documentation and receipts relating to any storage facilities; keys to those storage facilities; devices capable of counting large sums of currency; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales.

4.      Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; records of telephone calls recorded in writing; notes reflecting telephone and pager numbers or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs, including still photos, negatives, movies, slides, video tapes, and undeveloped film; and audiotape recordings of conversations, including those made over telephone answering machines.

5.      Records of travel including, but not limited to, tickets; transportation schedules; passports; automobile rental records; motel/hotel receipts; and any notes and other receipts related to travel.

6.      Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including, but not limited to, keys; photographs; deeds; mortgages; lease agreements; rental receipts; canceled checks; bills; titles; and registration documents.

7.      Drug paraphernalia, including, but not limited to, digital scales; plastic bags; gel caps; vials; cutting agents (i.e. Mannitol and Quinine); metal pressing devices for compressing controlled substances; razors; kilogram wrappers; and other items used in the preparation and packaging of controlled substances.

8.      United States currency or currency equivalents.

9.      Suitcases; file cabinets; or other locked or unlocked containers; hidden compartments that may contain any of the items listed in Nos. 1 – 7; and the contents thereof.

10.     Locked or unlocked safes (and law enforcement officers may drill the same).

11.     Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.

12.     With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.

**<u>No electronic devices seized from the Target Premises will be searched until further authorization from the Court, and according to protocol approved by the Court.</u>**